UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DAVID W. BATHKE,<br><br>        Plaintiff,<br><br>    v.<br><br>CITY OF OCEAN SHORES,<br>CRYSTAL DINGLER,<br><br>        Defendants. | CASE NO. C19-5338 BHS<br><br>ORDER GRANTING IN PART<br>AND DENYING IN PART<br>DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT |

This matter comes before the Court on Defendants City of Ocean Shores ("City") and Crystal Dingler's ("Dingler") (collectively "Defendants") motion for summary judgment. Dkt. 38. The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants in part and denies in part the motion for the reasons stated herein.

### I. PROCEDURAL HISTORY

On April 23, 2019, Plaintiff David Bathke ("Bathke") filed a complaint against Defendants asserting numerous claims. Dkt. 1. On May 17, 2019, Bathke filed an amended complaint asserting claims for violations of his due process rights under 42 U.S.C. § 1983 and breach of contract. Dkt. 11.

On June 28, 2019, Defendants filed a motion requesting summary judgment on the § 1983 claims and arbitration on the breach of contract claim. Dkt. 13. On October 4,

ORDER - 1

2019, the Court granted the motion on Bathke's § 1983 claims and denied the motion on the breach of contract claims. Dkt. 27.

On October 7, 2019, the Court granted Bathke's unopposed motion for leave to file a second amended complaint ("SAC"). Dkt. 29.

On October 8, 2019, Bathke filed a motion for reconsideration of summary judgment limited to his § 1983 claim for a post-termination name-clearing hearing. Dkt. 31. On October 9, 2019, the Court denied the motion. Dkt. 32.

On October 16, 2019, Bathke filed his SAC. Dkt. 35. Bathke asserts seven claims for relief as follows: (1) breach of contract, (2) failure to provide due process, (3) failure to provide a name clearing hearing, (4) declaratory relief, (5) retaliation, (6) promissory fraud, and (7) negligent misrepresentation. *Id.* ¶¶ 33–77.

On March 16, 2020, Defendants filed a motion for summary judgment on Bathke's claims. Dkt. 38. On April 6, 2020, Bathke responded. Dkt. 54. On April 10, 2020, Defendants replied and moved to strike evidence Bathke submitted in support of his motion. Dkt. 55.[1] On April 15, 2020, Bathke filed a surreply responding to Defendants' motion to strike and moving to strike some of Defendants' evidence. Dkt. 60.[2]

## II.   FACTUAL BACKGROUND

Bathke has over 35 years of experience in firefighting and managing fire departments and has served as the fire chief of three different city fire departments. Dkt.

---

[1] The Court denies the motion to strike as moot because the evidence is irrelevant to the consideration of the issues.

[2] The Court denies the majority of the motion to strike as moot with the sole exception being the reference to Bathke's state court complaint, which the Court considered.

54-3, ¶ 2. In April of 2017, Bathke interviewed for the fire chief position with the City. *Id.* ¶ 4. After the interview, Dingler, the City's mayor, asked Corey Kuhl ("Kuhl"), a lieutenant in the City's Fire Department, to conduct a background check on Bathke. Dkt. 45, ¶ 3. In addition to speaking with the individuals Bathke had listed as references, Kuhl decided to reach out to individuals at several fire departments in Washington that he knew interviewed Bathke as well. *Id.* ¶ 7. Kuhl contacted PJ Knowles ("Knowles"), the union president for the Maple Valley fire department. *Id.* On April 11, 2017, Knowles responded by sending Kuhl the two-page letter Knowles had drafted as his recommendation against hiring Bathke in Maple Valley, which reads as follows:

> David Bathke started as a firefighter in West Bend Wisconsin in 1986. He left in 1992 for Wauwatosa FD and became a paramedic/firefighter. David became a paramedic instructor and was hired part time with Lisbon FD while still working full time at Wauwatosa. The Lisbon fire chief was in need of recruiting new paramedics (all part-timers) and hired David along with a couple other experienced medics to mentor and oversee the newer inexperienced medics. David and the other "senior" medics were given the title of Captain based solely on their medic experience and oversight of the junior medics. David was hired by Ripon Area FD as fire chief in 2011, a rural fire district with no career firefighters at that time. Within the same year of his hiring at Ripon, David was offered and accepted a Battalion Chief's job (more accurately an assistant chief's job) at Hellsgate FD where he is currently the fire chief.
> 
> Bathke was the union president in Wauwatosa for a short time in addition to being a teamster before his firefighting days, but he didn't speak on this nor any other union experiences which made me wonder why. According to those in Wauwatosa who worked with him, he burned all his bridges with administration for his aggressive handling of union issues with management. While he is acknowledged as highly intelligent, he is also deemed selfish and will take care of himself first before the organization or the people in it. His time as a chief officer has been limited to the last four years.
> 
> What I didn't get from Bathke was true honesty. He made claims that he has been successful in keeping all staff—all 39 of them through the hardest times. In reality, the district has only 9 paid employees with the rest

being provisional (or part-timers, similar to our residents). In 2015, without a SAFER grant, those 9 would have been reduced to five firefighters. In 2014, there were 11 paid firefighters. During the entire time, he basically promoted himself and made statements that I believe he thought we wanted to hear. The difficulty in studying this candidate, is that he stated he did not want his line crew nor secretary to know he was testing out. Given this, we did not talk with his firefighters and had to be covert when talking with neighboring fd's firefighters.

Before Bathke was the chief of Hellsgate, the local jurisdictions worked more cohesively with each other. According to a Payson firefighter (neighboring department), they used to train together more often but not in the last two years (since Bathke has been chief). Bathke has alienated Hellsgate from the nearby fire departments, even to the extent that when a neighboring FD was suddenly without their fire chief and Bathke offered support, he was turned down.

**Hells gate fire departments revenue source.**

Their levy assessment of dollars is 787,000 and their overall budget is 2.2 million. A large amount of money that contributes to their budget is from grants, charges for transports, and wildland firefighting that stretches the resources thin.

The truth is the SAFER grant expires in 2017, the Hellsgate area is maxed out on their levy, and if Bathke cannot magically create more funding, they are back in the same predicament of not being able to retain career firefighters. Bathke is reaching to bring in another revenue source by creating a publicly funded ambulance service that charges. He is stretching out his firefighters to bring in more revenue. The avenues he uses are: wildland firefighting (talked about the huge amounts of money his type 6 fire trucks make when activated and currently has two trucks working across the country; one in Georgia), paramedic riding with his newly contracted air medivac, charging taxpayers for fire calls, and coming soon if approved by the state—a full on ambulance service staffed jointly with neighboring firefighters.

The funding for Hellsgate is a "house of cards" and I believe Bathke is looking to bail before it all comes tumbling down. His budget of $120,000 for legal expenses for this year is for a reason—to fight whoever gets in his way of creating a transport agency to bring in funding. This is with a revenue source of just $750k of tax levy monies.

After talking with a high level union representative, Bathke has co-taught with this individual a class on collaborative labor-management issues. The rep says Bathke is a nice guy, the kind of guy he would have a beer with. That is where the good ends. Bathke is the kind of chief who claims to have an, "open door policy" but uses it to divide his troops and is insincere. In Arizona where there is no collective bargaining laws, they use

1    the term, "meet and confer" whereupon the chief works out the employees'
     benefits then meets with the union representative and delivers the either
2    good or bad news. That is the end of it. In Bathke's world, his members'
     not asking for a "meet and confer" is a win for him. Basically, the troops
3    are afraid to even ask for what they are deserved. He is also considered a
     conniving person who is manipulative.
4           This applicant concerns me greatly as I feel he is deceitful and his
     motivation for our fire chief's position is all wrong. He is looking first and
5    foremost to leave AZ. for WA. Whatever job he lands will be sufficient. He
     tested for both Tukwila and KCFD 20 and was not hired there. Also, his
6    department in AZ is a significantly smaller operation compared to our fire
     district and I feel he is the least suited for our type of department.
7           **Side note**: In 2014, a Hellsgate provisional (volunteer) firefighter
     died during a physical endurance test for certification for wildland
8    firefighting. Not to put blame nor responsibility, I think it pertinent
     information for review as this is a significant event. NIOSH Report:
9    http://www.cdc.gov/niosh/fire/pdfs/face201412.pdf
            **Firefighters' comments**
10          I wouldn't want to work for him.
            He's a snake.
11          He's very selfish. Always looking out for himself.
            He didn't take direction well as a fire fighter in Wauwatosa.
12          He was never promoted because he burned too many bridges.
            He's very smart and well educated. He was said to Know FLSA
13   better than FD Admin. Members generally relay if he was on your side it
     was a good thing. If he was against you, you're in trouble.
14          Knows Labor law very well. Is earning his law degree.
            I keep hearing- Very smart, very selfish.
15          Interview with David Bathke in person, Hells Gate FD was focused
     on funding mechanisms that were not sustainable.

Dkt. 45 at 45–46. Kuhl forwarded this letter from his personal email to Dingler's

personal email. Dkt. 54-5 at 1. Dingler contends that "[a]t the time, [she] had some

concerns about what was contained in the memo; but also felt that it was so inflammatory

as to make me question whether it reflected some bias." Dkt. 42, ¶ 9.

       On April 22, 2017, Dingler offered Bathke the position as the City's fire chief. *Id.*

¶ 12. As part of the hiring process, Bathke and the City entered into an agreement stating

that he could not be terminated except for "cause." Dkt. 14-1 at 5. In November 2017, Bathke completed his probationary period, and the City converted his position to a full-time position.

In November 2018, Dingler met with the City's Human Resource Specialist Dani Smith ("Smith") regarding concerns about Bathke and the fire department. Smith informed Dingler that the union firefighters were considering a vote of "no confidence" against Bathke. Dkt. 42, ¶ 21. Dingler then spoke with Kuhl who confirmed that Bathke had lost the confidence of the department. *Id.* ¶ 23. Dingler contends that she then spoke with Bathke regarding the impending vote of "no confidence." *Id.* Bathke declares that this meeting did not happen. Dkt. 54-3, ¶ 25.

On December 13, 2018, Dingler attended a meeting with Smith and senior firefighters. Dkt. 42, ¶ 24. Kuhl informed her "that 100% of the union members had issued a vote of 'no confidence' concerning" Bathke. *Id.* Two senior firefighters

> then proceeded to describe the significant areas of concern regarding Chief Bathke's management of the department, including his disregard for and alienation of staff; his arrogant and narcissistic manner; the fact that his conduct was causing some members to seek employment with other agencies; his poor relations with Grays Harbor Emergency Management (GHEMS); and other areas of significant concern.

*Id.* On December 14, 2018, Dingler placed Bathke on administrative leave to conduct an investigation into the allegations against him. *Id.* ¶ 25. Bathke declares that the suspension "came as a complete surprise." Dkt. 54-3, ¶ 32.

After Dingler and Smith conducted an initial investigation, Dingler retained the services of an outside investigator, Robin Nielsen. Dkt. 42, ¶ 28. "Based on Ms.

1  Nielsen's initial verbal report of what she was learning from speaking with the various

2  witnesses, [Dingler] decided to have [Nielsen] suspend her investigation." *Id.* ¶ 29.

3  Dingler essentially concluded that it would be better for the City to "explore the

4  possibility of negotiating a severance and separation agreement" with Bathke rather than

5  resolve the issues leading to his suspension. *Id.*

6  On January 9, 2019, Kuhl sent Dingler an internal memo regarding the union's

7  vote of no confidence and attached Knowles's letter. Dkt. 54-19.  Kuhl stated that all of

8  the union members, nineteen out of nineteen, "overwhelming approved a vote of no

9  confidence in Chief Bathke." *Id.* at 1.  Kuhl also provided a list of six areas of concern in

10  Bathke's leadership with short descriptions of those concerns. *Id.* at 2–4.

11  On January 16, 2019, Dingler sent a memo to Bathke informing him of the City's

12  offer for Bathke to resign in return for four-months' severance starting February 8, 2019.

13  Dkt. 14-6. Dingler stated that if Bathke refused the offer, then Bathke would be placed on

14  unpaid leave after February 8, 2019 and that she would "begin the disciplinary process

15  which will include providing [Bathke] appropriate notice and an opportunity to be heard

16  as to the basis for moving forward with separation." *Id.*

17  Bathke refused the City's offer and retained counsel.  On January 23, 2019,

18  Bathke's counsel sent a letter to Dingler officially rejecting the offer of resignation and

19  demanding that Bathke be removed from administrative leave and returned to his position

20  as fire chief. Dkt. 14-7.  The letter contested the "cause" for termination and put the City

21  on notice that if the City proceeded with termination, Bathke intended to pursue all

22  available legal remedies. *Id.*

On February 13, 2019, Dingler responded. Dkt. 14-8. She directed Bathke to appear at a pre-termination hearing and provided a summary of charges. *Id*. Dingler set forth six categories of charges as follows: (1) failure to establish trust and confidence among staff, (2) poor judgment and decision-making with respect to purchases and expenditures, (3) failure to comply with policies and legal requirements in personnel matters, (4) failure to respond promptly or properly to calls, (5) disrespectful comments and behavior to and about others, and (6) dishonesty. *Id.* Dingler attached over 150 pages of documents supporting the charges. *Id.* On March 12, 2019, the hearing was held. On March 22, 2019, Dingler sent Bathke a letter informing him of the City's decision to terminate his employment for cause. Dkt. 14-10.

Bathke contends that several media posts have appeared after his termination. For example, Bathke cites a March 13, 2019, article in the North Coast News that contains damaging allegations against Bathke. Dkt. 54-3, ¶¶ 56–58. The article was based on documents provided to the paper from the City pursuant to a public records request. *Id.* ¶ 57. Bathke declares that the article has been "picked up by numerous national and worldwide fire service media outlets and magazines." *Id.*

Based on these articles, Bathke alleges that the City placed this damaging material in his personnel folder sometime after it placed him on leave on December 14, 2018. *Id.* Bathke also declares that he has applied for over 140 jobs throughout the nation but has "not been offered any employment in [his] chosen profession as a firefighter or public safety professional." *Id.*

## III.  DISCUSSION

**A.  Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically

1  attested by that party contradict facts specifically attested by the moving party.  The

2  nonmoving party may not merely state that it will discredit the moving party's evidence

3  at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W.*

4  *Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory,

5  nonspecific statements in affidavits are not sufficient, and missing facts will not be

6  presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

7  **B.     Due Process**

8        Bathke's remaining due process claim is based on allegations that Defendants'

9  actions have prevented him from obtaining employment in his profession.  The Ninth

10 Circuit has held that "there is substantive due process protection against government

11 employer actions that foreclose access to a particular profession to the same degree as

12 government regulation."  *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 998 (9th Cir.

13 2007), *aff'd*, 553 U.S. 591 (2008).  The claim, however, is limited to "extreme cases,

14 such as a 'government blacklist, which when circulated or otherwise publicized to

15 prospective employers effectively excludes the blacklisted individual from his

16 occupation, much as if the government had yanked the license of an individual in an

17 occupation that requires licensure.'"  *Id.* (quoting *Olivieri v. Rodriguez*, 122 F.3d 406,

18 408 (7th Cir. 1997)).

19       Here, Defendants move for judgment on Bathke's due process claim arguing that

20 he has failed to submit any evidence that a relevant City employee or Dingler circulated

21 or publicized stigmatizing content.  Dkt. 38 at 10-13.  The Court agrees because Bathke's

22 claim is supported only by his own speculation.  For example, he alleges that "the City"

or "Dingler" leaked Knowles's letter to the public and press. Bathke, however, submits no actual evidence to support these allegations beyond his personal opinion. In fact, Defendants have submitted a complaint that Bathke filed in state court alleging that Kuhl intentionally leaked the letter to harm Bathke.[3] In the absence of any facts to support Bathke's speculation, the Court concludes that Bathke has failed to create genuine issues of fact for trial on this issue.

Similarly, Bathke asserts that someone from the City's fire department submitted a complaint to the Washington Department of Health ("DOH") in an attempt to have Bathke's paramedic license revoked. Dkt. 54 at 24. The complaint, however, was submitted anonymously, and the DOH closed the report without an investigation because there was insufficient information to support the allegations. Bathke fails to explain how this anonymous and uninvestigated complaint is either detrimental to his career prospects or creates liability against Defendants.

Finally, Bathke vaguely refers to comments Dingler made that appeared in some news articles. Dkt. 54 at 24. In reply, Dingler sets forth three statements that could potentially be considered damaging to Bathke's reputation. Dkt. 55 at 5. But all three statements are reference circumstances that occurred such as Dingler placing Bathke on leave while she investigated the allegations presented by the union. Bathke has failed to establish any question of fact that these statements rise to the level of a government blacklist as opposed to simple factual summaries of actual events. In fact, Knowles's

---

[3] Although Bathke moves to strike this complaint, the Court may take judicial notice of its existence. Fed. R. Evid. 201.

ORDER - 11

letter contained accusations that were more detrimental to Bathke's reputation, and he was still hired after that letter was shown to the hiring committee. Therefore, the Court grants Defendants' motion on Bathke's substantive due process claims because Bathke has failed to submit sufficient evidence to establish material questions of fact for trial.

**C.   Breach of Contract**

"In a wrongful termination case, whether an employer properly determined it had just cause for termination is a question for the trier of fact." *Lund v. Grant Cty. Pub. Hosp. Dist. No. 2*, 85 Wn. App. 223, 228 (1997).

In this case, Bathke's declaration and supporting evidence sufficiently creates a question of fact on the issue of whether the City had just cause to terminate him. In reply, Defendants attempt to undermine the holding in *Lund* by misquoting employment discrimination cases. *See* Dkt. 55 at 11. Defendants, however, fail to provide any persuasive authority or reason to take this question of fact away from the factfinder. Therefore, the Court denies Defendants' motion on Bathke's breach of contract claim.

**D.   Other Issues**

Defendants moved for summary judgment on all of Bathke's claims, and Bathke only responded to the substantive due process claim and the breach of contract claim. Dkt. 54. As to Bathke's other claims, the Court grants Defendants' motion for summary judgment and dismisses Bathke's claims for retaliation, promissory fraud, and negligent misrepresentation.

Regarding trial, the Court does not know when civil jury trials will resume in this district. Although the courthouse is currently scheduled to open September 8, 2020, jury

1   trials will not begin at that time and, when jury trials do begin, the Court has numerous

2   criminal trials that must be held before civil trials. The parties should consider a bench

3   trial if they intend to keep their November 3, 2020 trial date. In the event that this trial is

4   reset to a date in mid- to late-2021, the Court may consider declining supplemental

5   jurisdiction over the remaining state law claim. *Notrica v. Bd. of Sup'rs of Cty. of San*

6   *Diego*, 925 F.2d 1211, 1214 (9th Cir. 1991) (court should balance "judicial economy,

7   convenience, fairness, and comity" in considering whether to assert pendant jurisdiction

8   over state law claims after dismissing all federal claims).

## IV.  ORDER

Therefore, it is hereby **ORDERED** that Defendants' motion for summary judgment, Dkt. 38, is **GRANTED in part** and **DENIED in part** as stated herein. The Clerk shall terminate Dingler as a party.

Dated this 19th day of August, 2020.

BENJAMIN H. SETTLE
United States District Judge