1

2

3

4

5

6

7            **UNITED STATES DISTRICT COURT**

8            **WESTERN DISTRICT OF WASHINGTON**

9

10   DAVID W. BATHKE,                    Case No. 3:19-cv-05338-BHS

11            Plaintiff,

12            vs.                        **BATHKE TRIAL BRIEF**

13   CITY OF OCEAN SHORES, CRYSTAL
     DINGLER,
14
              Defendants.
15

16       **A.  The Exempt Employee Agreement**

17          This is a breach of contract action. Plaintiff, Chief David Bathke ("Chief Bathke") entered

18   into an Exempt Employee Agreement (Ex.106)[1] containing the following protections from

19   termination:

20   "Employees' employment shall not be terminated by the City except for *"cause", with the grounds*

21   *therefor to be the same as those applicable to the City's union-represented employees*, including

22   provisions relating to any reduction-in-force." (*emphasis added*)

23          This language not only prevents Chief Bathke from being terminated "except for cause," but

24   also states that the standard provided to any termination of Chief Bathke was to be the same standard

25   applied to the "City's union-represented employees."

26

27   ───────────────────
     [1] All exhibits refer to those contained on the Trial Exhibit List.
28

BATHKE TRIAL
BRIEF - 1

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
*24411 Ridge Route Ste, 200, Laguna Hills, CA 92653*
*T: (949) 580-3737 F: (949) 580-3738*

1    That this is the standard to be applied was admitted to by the City. In an email dated January

2    10, 2019 from the City's attorney to the person brought in to investigate this matter, the City

3    attorney's instruction were the following:

4    　　　　　"This is not an employment contract with department heads, but rather an agreement

5    　　　　　that was reached back in 2009 between the city and the "exempt employees" (i.e.,

6    　　　　　department heads, including the police chiefs).  It includes a provision that exempt

7    　　　　　employees will have the same "just cause" standard for termination as unionized

8    　　　　　employees." (Ex.115).

9    　　Indeed, the Exempt Employee Agreement refers to the exempt employees as an "Exempt

10   Employees bargaining unit." The reason for this is that department heads are, by definition, exempt

11   from the civil service rules (hence the term Exempt Employees).  In order to be afforded the same

12   protections as the union members who are protected by the civil service rules, the Exempt Employees

13   formed a bargaining unit and negotiated these same protections as part of their agreement.

14   　　Chief Bathke will testify that when he was hired it was important to him that he be provided

15   these protections from being terminated.  This is because he was being brought into a department

16   that had a history of a revolving door regarding fire chiefs where the past several chiefs had lasted

17   two years or less, a department that had been without a fire chief for a number of months, and a

18   department which was fraught with problems.

19   　　Chief Bathke was brought in to fix these problems and he knew that the changes he would

20   have to make would not be popular. It was therefore important that the City, and specifically Mayor

21   Dingler, support his efforts.  What he found out is that after he did exactly what he was tasked to do,

22   the Mayor instead of supporting him, threw him under the bus. It was precisely because Chief Bathke

23   was concerned that the political climate would cause the Mayor to turn against him that he insisted

24   that he be afforded the safeguards against termination.  When he was hired, the Mayor assured him

25   that the Exempt Employee Agreement provided these needed safeguards.

26

27

28

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
*24411 Ridge Route Ste, 200, Laguna Hills, CA 92653*
*T: (949) 580-3737 F: (949) 580-3738*

**The Hiring of Chief Bathke**

When the City was in the process of recruiting a new fire chief it had been without a fire chief for almost six months and faced a number of challenges, both economic and non-economic, including the following:

1. The fire department was running over budget by an annual amount of almost $200,000 in unbudgeted overtime wages paid to the firefighters. For a small city such as Ocean Shores, this is a significant amount.

2. Seven of its firefighters had been hired pursuant to what is known as a Safer Grant. This grant was due to expire, and the City would lose about one-third of its full-time firefighting/EMS force. This posed a huge safety issue for the City.

3. The City's fire engines were old and antiquated.  Two of the fire engines had passed their service life per the National Fire Protection Agency ("NFPA") standard, in fact, they qualified for "collector plates."  A new, modern day engine was needed.

4. The fire department was on an antiquated paper scheduling and timecard system.  The firefighters had objected to convert to an electronic records management system which needed to be done to comply with state and federal mandates and data collection.

5. The firefighters had been working for six months without a contract because the City had not agreed with the terms demanded by the Union. The City needed a chief that could be tough and get an agreeable contract completed. (Ex. 107)

6. The fire department is a quasi-military organization, yet the firefighters had arranged themselves in three different shifts which were working independent of each other. This lack of uniform leadership compromised the proper chain of command and resulted in unnecessary overtime, safety issues, and failure to follow call response policies.

7. The fire department members needed proper modern training programs, as their lack of training presented a safety issue.

During her interview with Chief Bathke, Mayor Dingler explained to him these, and other issues, in detail. She told him that it would be a challenge but that she needed a strong, no-nonsense

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
*24411 Ridge Route Ste, 200, Laguna Hills, CA 92653*
*T: (949) 580-3737 F: (949) 580-3738*

1   chief who would not be afraid to command the firefighters. Indeed, the union firefighters have been
2   without consistent leadership for several years and were used to running the department themselves.
3   The police chief had oversight of the fire department for a period of time. After that, the new fire
4   chief hired by the City, Tom Lique, lasted for two years before he was asked to resign in December
5   of 2016.

6        Mayor Dingler asked Chief Bathke if he was a personality that could take on this out of
7   control department, and he said he could. She informed him the firefighters have been without a
8   contract for several months. He warned her that any change would cause discontent with the
9   firefighters especially in that he would be reducing their compensation by cutting out unneeded
10  overtime and holding them accountable in following city policies.  The Mayor told him that she
11  understood this, and she would fully support him.

12       Unbeknownst to Chief Bathke, as part of her background check on him, the Mayor had
13  secretly received a 2-page letter from the Maple Valley fire department's union leader written in
14  November of 2016 which she describes in her declaration as being "very unflattering" to Chief
15  Bathke. (Ex. 151). This letter specifically informed the mayor that Chief Bathke went so far as to
16  "burn bridges" because of his "aggressive handling of union issues with management" and that he
17  "stretch[ed] out his firefighters to bring in more revenue." (Ex.102). It also included disparaging
18  language calling Chief Bathke "conniving," "insincere," "manipulative," "deceitful," "selfish," a
19  "snake," not "honest."  When the mayor received this secret Maple Valley union letter, she responded
20  in an email saying, "not what we wanted to hear, but I suspect what we needed to hear."  In other
21  words, the mayor knew exactly the type of personality she was hiring as it was necessary for her to
22  bring in outside leadership to resolve the issues at hand.

23       Mayor Dingler and Ocean Shores' fire department's Union leader, Corey Kuhl, exchanged
24  this Maple Valley letter on their personal email (as opposed to their official City email). (Ex.102).
25  For some reason, this Maple Valley letter was kept confidential and hidden from Chief Bathke as
26  well as any of the other firefighters until the actual "no confidence" vote was taken eighteen months
27  later at a union meeting on December 10, 2018. During this meeting, Corey Kuhl projected the letter

28

BATHKE TRIAL
BRIEF - 4

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
*24411 Ridge Route Ste, 200, Laguna Hills, CA 92653*
*T: (949) 580-3737 F: (949) 580-3738*

on the wall to obtain support for the no confidence vote.  Why it was kept from the firefighters and not discussed during the interview process is unknown.

**Commencement of Work**

In April of 2017, the Mayor offered Chief Bathke the full-time fire chief's position starting in June, in addition to a job immediately as a consultant prior to taking the office of fire chief. Chief Bathke immediately worked as a consultant for the Mayor on issues she had with the Union. He began his tenure as fire chief in June of 2017. The Mayor's office is in the fire department building. His office was immediately adjacent to her office and they shared a common door.  Chief Bathke will testify that he conferred with the Mayor on a daily basis. At the Mayor's request, Chief Bathke kept the Mayor apprised of the fire department's operational activities since the outset. That is, the Mayor was intimately involved and directed the majority of all of the decisions made by Chief Bathke during his tenure.

The Chief immediately went to work to make the needed changes as directed by the Mayor, and accomplished the following:

1.  He reduced the overtime problem, and during his 1 ½ years as Chief, the department operated within budget.  After he was terminated, it is apparently over budget again.

2.  He was instrumental in obtaining an extension of the Safer Grant and assisted the City in its efforts to raise the ambulance utility rate, while taking it off the City's general fund, which allowed the City to save the jobs of the seven firefighters.

3.  He was instrumental in obtaining a new, state of the art, fire engine through the acquisition of an AFG grant by assisting the City's fire department grant writers as he is well-trained in grant writing and has been a grant peer evaluator for FEMA grants. Indeed, the Mayor has listed the new engine as part of her accomplishments while acting as Mayor.

4.  He converted the fire department to a new, electronic records management system, and by doing so it allowed the City to comply with state and federal mandates and data collection. Additionally, these electronic records programs provided electronic scheduling and payroll accountability, electronic patient reporting and billing, call statistics analysis, which

BATHKE TRIAL
BRIEF - 5

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
*24411 Ridge Route Ste, 200, Laguna Hills, CA 92653*
*T: (949) 580-3737 F: (949) 580-3738*

1    increased revenue for the fire department.

2    5. He assisted the Mayor with negotiating a new collective bargaining agreement with the Union

3        firefighters. The City and the Union could not come to an agreement until eighteen months

4        after its expiration due to the Union's unreasonable demands.

5    6. He rearranged the firefighters and changed the three different shifts to facilitate safety training

6        and mentoring of the junior firefighters by the senior firefighters. By doing this, he was able

7        to reduce unnecessary overtime and created uniformity within the department.

8    7. He brought in multiple training classes to the City to allow the firefighters to become properly

9        trained in NFPA safety measures and to learn the most current practices.

10   After six months, the probationary period ended and Chief Bathke was made a tenured fire chief

11   and received a raise in pay. At that time, on November 12, 2017, the Mayor wrote Chief Bathke

12   congratulating him and stating "I am impressed with your leadership skills and style and look forward

13   to a long career for you here in Ocean Shores. Thank you for joining our team." (Ex.110).

14   During this time, Chief Bathke held monthly formal "Officers Meetings." Minutes were kept

15   of each of these meetings. (Ex.173). The purpose of the meetings was to discuss the changes and the

16   best way to handle them. Because a fire department is a quasi-military organization, the expectation

17   is that the officers would implement the changes with those they supervised. He also started periodic

18   "Safety Committee Meetings." The purpose of this was to allow input on safety issues that may be

19   of concern with the firefighters.

20   Chief Bathke thought it was important that he provide support to the City Council and

21   members of the public. He attended virtually all of the City Council's meetings. He prepared and

22   presented department budget/status reports to the City Council and residents of Ocean Shores.

23   **No Complaints Filed Regarding Chief Bathke**

24   While Chief Bathke was the fire chief, not one complaint was filed by any employee

25   (firefighter or otherwise) against him, even though the City and the fire department have a strict

26   policy of both allowing the filing of complaints and also of prohibiting retaliation for the filing of

27   any complaint (Ex.174). The fact that no complaints were ever filed against him is noteworthy

28

BATHKE TRIAL
BRIEF - 6

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
*24411 Ridge Route Ste, 200, Laguna Hills, CA 92653*
*T: (949) 580-3737 F: (949) 580-3738*

1  because the firefighters had a reputation of filing a complaint for even the smallest perceived

2  transgression. For instance, one firefighter complained that there needed to be an additional

3  microwave in the kitchen as he did not like to wait when someone else was warming their meal.

4      Also, during Chief Bathke's tenure, not one Grievance was filed with the Union regarding

5  any of the issues used by the Mayor to justify terminating Chief Bathke. This is also of interest

6  because the City's firefighters had no hesitation for filing a Union Grievance even if they felt they

7  had been shorted by two dollars in their paycheck.

8      The City's policy as expressed in its Personnel Manual, states, *"Employees are to be*

9  *evaluated by their Department Heads or supervisors prior to completion of their probationary period*

10  *and at least once every 12 months thereafter. The evaluation is part of an employee's personnel*

11  *record and may be a factor in determining the employee's conversion to regular status, whether the*

12  *employee receives a wage increase, or is to be promoted, transferred, demoted, laid off, or*

13  *terminated"*. (Ex.108). The Mayor never brought to Chief Bathke's attention any concerns or any

14  complaints being expressed by the unionized firefighters and did not give Chief Bathke an annual

15  performance evaluation. The only indication he had about his job performance were positive

16  compliments from the Mayor to him until after the Union vote of no confidence was taken.

17  **The No Confidence Vote**

18      On December 10, 2018, the firefighter's union took their vote of no confidence. It was not

19  part of their meeting agenda. It was brought up at the end of the meeting under the generalized

20  category entitled the "Good of the Order" which is a time for general comments to be made.

21  (Ex.111). By this time, several of the firefighters had left the meeting and did not take part in the

22  vote. The motion was presented by the Union president, Corey Kuhl, who projected on the wall the

23  disparaging Maple Valley Union letter from 2016 that he had kept secretly hidden for eighteen

24  months, and he used this to convince the other members to vote for the no confidence. It is unclear

25  whether the vote was an open, verbal vote, a hand vote or was by secret ballot. Neither the Union nor

26  the City have ever produced any written ballots.

27

28

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
*24411 Ridge Route Ste, 200, Laguna Hills, CA 92653*
*T: (949) 580-3737 F: (949) 580-3738*

On December 13, 2018, the proponents of the no confidence vote, Corey Kuhl, Union local president and Matt Krick, a captain of the City's fire department, presented to the Mayor that a unanimous no confidence vote had passed and demanded that if she did not take action against Chief Bathke they would take it to the "press and news if necessary." (Ex.114). This was important to the Mayor because she was involved in a hotly contested Mayor race which she ultimately won by a mere three votes after receiving the firefighters Union's endorsement. The Minutes from the Union meeting clearly shows that the no confidence vote was not unanimous as reported to the Mayor and eventually to the media. (Ex. 111).

On December 14, 2018, the day after the Union leaders made its demand, Mayor Dingler entered into Chief Bathke's office, handed him a letter informing him that she was putting him on administrative leave in light of the fact that the union had issued a vote of no confidence regarding his leadership of the department. He was immediately required to turn over his work phone, his work vehicle, work computer, city credit card, and all fire department keys, and was escorted out of the building by a police officer in full view of the public, firefighters, and other office workers at the direction the Mayor. This came as a complete shock to Chief Bathke. He had no knowledge that there were major issues between him and the Union or that a no confidence vote would be taken. Needless to say, Chief Bathke was devastated.

The Mayor never counseled Chief Bathke on any problems, nor arranged a meeting between the Chief and the Union leaders to try and resolve any issues. This is a violation of the City's progressive and corrective policy which is found not only in the fire department's general orders, but also in the City's contract for the City's union members.

After speaking to some, but not all, of the firefighters, the Mayor engaged the services of Robin Nielsen, an outside investigator to conduct an independent investigation. However, Mayor Dingler arranged for Ms. Nielsen to speak to only six of the firefighters who were described as the "moving force" behind the vote. (Ex.113). Indeed, these six firefighters whom the Mayor chose for Ms. Nielsen to interview were the six that had experienced the largest decline in their overtime compensation as a result of the changes Chief Bathke had implemented. (Ex.138).

BATHKE TRIAL
BRIEF - 8

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
*24411 Ridge Route Ste, 200, Laguna Hills, CA 92653*
*T: (949) 580-3737 F: (949) 580-3738*

**The Independent Investigator Hired by the City Concludes there was No Cause for Termination**

On January 9, 2019, Ms. Nielsen came to the City to interview the firefighters that were the moving force behind the no confidence vote. The investigator never spoke to Chief Bathke, never spoke to any of the other 13 full time fire fighters, never spoke to any of the volunteer fire fighters, never spoke to any witnesses that may have supported the chief, and never spoke to any of the fire chiefs in the area that were impressed and complimentary to Chief Bathke. (Ex.170).

After her limited interview of the "moving force" firefighters, on January 11, 2019, Investigator Nielsen informed the City of her conclusion that there was no case for harassment or discrimination. She went on to say that there may be performance issues and asked if the City wanted her to investigate these issues which would require that the City provide her with a job performance standard for the fire chief and would include interviewing Chief Bathke.  The City responded a few days later on January 15, 2019, by instructing Ms. Nielsen to suspend her investigation. The very next day, January 16, 2019, Mayor Dingler informed Chief Bathke that she "did not see a way forward for him". The Mayor states in her letter, "If you do not wish to accept a separation agreement, then you will be placed on *unpaid* leave after February 8 and I will begin the *disciplinary process* which will include providing you with appropriate notice and an opportunity to be heard as to the basis for moving forward with *separation*" *(emphasis added)*. (Ex.116). The Mayor made no offer to discuss corrective action and made no offer to negotiate the terms of the settlement. It is clear that the Mayor had already made up her mind to terminate Chief Bathke.

In response, Chief Bathke hired legal counsel, who responded with a letter reminding the Mayor that she could not terminate the Chief without a proper, unbiased pre-termination hearing. Chief Bathke could not accept the resignation; as to his knowledge, there was no basis for his discipline since he performed his job as directed by the Mayor. The letter also suggested that the parties attempt to mediate the situation which could be a "win, win" for each. (Ex.117). This was particularly true since Chief Bathke was 57 years old at the time and his prospects of obtaining other employment was small. The City failed to respond to this offer.

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
*24411 Ridge Route Ste, 200, Laguna Hills, CA 92653*
*T: (949) 580-3737 F: (949) 580-3738*

**The After-the-Fact Allegations Made Against the Chief**

Because Chief Bathke's attorney demanded to know on what basis the City was terminating the Chief, on February 13, 2019, the City provided Chief Bathke with a pre-termination list of charges against him. Chief Bathke was blindsided when he received this list of charges because this was the first time he had heard that any of these were issues of concern. Chief Bathke therefore set out to gather evidence to see if there was any truth to the allegations made against him. What he found out is that most, if not all, of the allegations had no truth whatsoever or were de minimus and had apparently been manufactured after the Union no confidence vote as a pretext to justify his termination. A summary of most of the charges and the evidence relating to them follows:

1. The Mayor alleged that Chief Bathke acquired poor fitting, and poor-quality bunker gear. The evidence was that the bunker gear was acquired from Viking Life Saving Equipment USA ("Viking"), a world leader in the manufacture of bunker gear. Chief Bathke required Viking to come to Ocean Shores to have each firefighter personally measured and fitted.  When the gear arrived, each firefighter tried it on and all, but a few, felt the fit was perfect.  For those few that had issues, Viking remanufactured new gear for them.  Chief Bathke does not recall any other complaints about the gear.  The gear met all NFPA guidelines and certifications for safety and Chief Bathke's experience with this same type of gear with other fire departments was positive.  The gear was also warranted for ten years, so if there were any problems with it, Viking would have gladly honored its warranty.  The gear was a second set of gear, as the City had never provided a second set of gear to the firefighters. Chief Bathke felt it was important that the fire gear be kept clean at all times. His experience was that a second, alternative set should be maintained, so that when the normal gear is dirty it could be cleaned and a second, back-up gear would be available.  A copy of a letter from Viking describing the gear and the warranty was presented to the City by Chief Bathke during the hearing on March 12, 2019. (Ex.135).

2. The Mayor alleged that Bathke used poor judgment by purchasing a replacement generator from Honda that was mounted on one of the engines that did not have a remote start. She also

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
*24411 Ridge Route Ste, 200, Laguna Hills, CA 92653*
*T: (949) 580-3737 F: (949) 580-3738*

alleged that he failed to take input from the firefighters regarding the generator. The evidence is that Chief Bathke authorized the acquisition of a new generator because of input from the firefighters that the old Honda model was failing.  He communicated with the firefighter who was responsible for acquiring the equipment, Jeremy Towery. In an email, firefighter Towery informed the Chief of the maximum dimensions for a replacement generator. The same Honda generator in an updated version was larger and would not fit into the dimensions provided by firefighter Towery. Chief Bathke therefore had no choice but to purchase a generator that would fit within the encasement dimensions. This was discussed with firefighter Towery who agreed that the Generac model that was purchased was a great comparable. After the Generac was installed, it was discovered that the remote control was not compatible with the electric start generator. When Chief Bathke heard about this problem, he tasked firefighter Towery with resolving this issue. After this, there were no complaints reported to Chief Bathke about the new generator until he received the Summary of Charges on February 13, 2019.  Attached is a copy of the email exchanged between the Chief and firefighter Towery where the Chief is informed of the maximum dimensions for a new replacement model. (Ex.147).

3. The Mayor alleged that he used poor judgment by purchasing "Paladin portable generators from a company that was going out of business."  The evidence is that Paladin did not go out of business but rather was acquired by Honeywell. These were small, handheld, portable generators that cost about $250 each.  At his deposition, firefighter Curt Begley admitted that the Paladin generator issued to him works and made his job safer. (Ex.152).

4. The Mayor alleged that Chief Bathke "forced" upon the firefighters a new digital calendaring software called Aladtec. Chief Bathke was tasked by the Mayor to convert the department from an antiquated, paper record keeping system, to an electronic reporting system. This was discussed at length with the Mayor and was determined to be a necessary change for the department. Both electronic systems, Aladtec and Image Trend, are currently used by the fire department and provides multi-purpose functions as well as reporting compliance.

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
24411 Ridge Route Ste, 200, Laguna Hills, CA 92653
T: (949) 580-3737 F: (949) 580-3738

1

2

3

4

5

6

7

8

9

10

5.  The Mayor alleged that Chief Bathke failed to follow protocol and provide certain rights to firefighter Schmitz who was the subject of disciplinary process in July and August of 2018. The evidence is that Chief Bathke followed closely the directions of not only HR Specialist Dani Smith, but also the City's labor attorney Beth McIntyre during these proceedings. Indeed, at the initial interview he insisted that HR Specialist Smith be present as well as having captain Mike Thuirer and firefighter Schmitz' union representative present. The next day he sought and received emails from attorney McIntyre outlining the process and protocol to be followed.  He at all times followed the directions from the Mayor, Dani Smith, and attorney McIntyre. Although the Mayor claims that this incident resulted in a grievance being filed, the evidence is that no grievance was filed.

11

12

13

14

15

16

17

6.  The Mayor alleged that he "endangered the lives of our citizens by permitting a retired fire chief friend of yours to be in charge of the station for the department over the fourth of July holiday."  The evidence is that given the demands on the department during the fourth of July holiday, the department would seek out and hire multiple volunteers. One of the volunteers hired was a firefighter named Brian Petersen who had over 30 years' experience and had previously worked as a chief. (Ex.149). Chief Bathke's belief was that it was better to use someone with command experience rather than someone with no experience.

18

19

20

21

22

23

24

7.  The Mayor alleged that "fire stations are uniformed quasi-military run organizations" and that Chief Bathke would break the chain of command by speaking directly with lower ranking firefighters. The evidence is that the chief would hold officers' meetings where only the officers were present, and issues would be discussed so the officers could implement them with their subordinates.  Given that Ocean Shores is a small fire department, the Chief believed it would have been wrong for the Chief to ignore communications from any fire department personnel.

25

26

27

8.  The Mayor alleged that the chief was "not present" at a fatality fire "until after the scene had cleared" and that he never "followed up with staff at all to inquire as to their wellbeing."  The evidence is that the chief was at the fatality fire and he produced photos that he took on his

28

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
24411 Ridge Route Ste, 200, Laguna Hills, CA 92653
T: (949) 580-3737 F: (949) 580-3738

cell phone confirming this. A copy of these pictures was presented to the Mayor at the March 12 hearing. After the fatality fire, the Chief did in fact communicate with captain Matt Krick, the officer in charge, and stated to Captain Krick if he or the crew needed anything to let the Chief know.

9. The Mayor alleged that the "staff had difficulty reaching [the chief] during a tsunami alarm". The evidence is that Chief Bathke was the incident commander during the tsunami alarm and was present and aware of all aspects of it. After this tsunami alarm, Captain Mike Thuirer sent Chief Bathke an email to thank him for taking charge. (Ex. 150)

10. The Mayor alleged that the chief had a reputation of "my way or the highway attitude." The evidence is that he worked closely with the Mayor on all decisions and actions taken.  The Mayor hired Chief Bathke, rather than promoting Captain Brian Ritter, who was the acting chief and had been with the department for 15 years, as the department was fraught with problems that needed to be fixed, and she needed a strong leader. (Ex.172).

11. The Mayor alleged that on one occasion, Chief Bathke slapped the table and pointed his finger at someone who disagreed with him.  Chief Bathke has no recollection of ever pointing his finger at anyone. However, if a subordinate is refusing to take direction, then the Chief, who was making drastic changes, would have no choice but to be firm and direct. The Chief does not use nor tolerate profanity.

12. The Mayor alleged that Chief Bathke had lost the trust and respect of his firefighters. When the Mayor did her investigation, she did not seek opportunities for more evidence, and did not interview other potential witnesses, which should be a consideration as well. Moreover, the Mayor ignored other evidence such as a personal letter written by a firefighter to Chief Bathke stating the following:

"CHIEF BATHKE, I SIT HERE TRYING TO THINK OF THE WORDS TO THANK SOMEONE LIKE YOURSELF WHEN THANK YOU IS JUST NOT ENOUGH…IT NEVER CEASES TO AMAZE ME THE SELFLESSNESS THAT PEOPLE SHOW

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
*24411 Ridge Route Ste, 200, Laguna Hills, CA 92653*
*T: (949) 580-3737 F: (949) 580-3738*

TOWARDS EACH OTHER IN THE FIRE SERVICE…I DO UNDERSTAND IT TAKES BABY STEPS JUST AS IT WILL TO MAKE CHANGES IN THE DEPARTMENT. IN TIME THE CHANGES WILL BE SO GREAT IT WILL BE WORTH THE WAIT. THE CHANGES YOU ARE ALREADY MAKING HAVE DEFINITELY BEEN NOTICED. I HOPE TO CONTRIBUTE TO THOSE CHANGE ANYWAY I CAN. THANK YOU SO MUCH FOR THIS OPPORTUNITY….” (Ex. 125)

On March 12, 2019, the mayor held an informal hearing in her private office regarding the charges. During the hearing Chief Bathke methodically presented the evidence refuting each and every charge made by the City.

At the hearing, Chief Bathke's counsel again brought up the fact that the City's own rules and regulation mandate a progressive, corrective handling of disciplinary matters and that termination was only a last resort after the other efforts had failed. He suggested that the City facilitate a meeting with the Union, the Chief, the Mayor and perhaps a corporate counselor to address any problems and work out a resolution. The City refused. Instead, ten days later, the Mayor sent a letter to Chief Bathke confirming his termination.

After he was terminated, Chief Bathke began searching for another job in the firefighting/EMS industry. He has placed more than 250 applications throughout the country and has been turned down on everyone, even with his many accomplishments, and past stellar performance reviews. (Ex. 127). This includes lowest level jobs in the industry. According to a fire industry expert, Jeff Heaton, the firefighting industry is somewhat unique in that the actions such as those that occurred with Chief Bathke are "detailed in national and worldwide distributed fire service media outlets, internet blogs, and magazines." This is exactly the case with Chief Bathke, and it has become impossible for him to find work in his profession of over 40 years.

## DISCUSSION

As discussed above, Chief Bathke is provided the same standards applicable to the "City's union-represented employees" when determining whether proper cause existed to terminate him.

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
*24411 Ridge Route Ste, 200, Laguna Hills, CA 92653*
*T: (949) 580-3737 F: (949) 580-3738*

1   This provided Chief Bathke several important protections none of which were followed by the City

2   in this case:

3   **A.   <u>The City Failed to Follow a Progressive, Corrective Procedure Prior to Termination.</u>**

4          In Ocean Shores, a Union worker is entitled to a multitude of procedural rights and processes

5   before he or she can be fired.  This process, according to the City's own published Orders, Standard

6   Operating Guideline 2000.00 entitled "Managing the Discipline Process," requires that the employee

7   be disciplined in a corrective, progressive manner with proper counseling and a Personal

8   Improvement Plan that attempts to correct the deficiencies. Only if the deficiencies are not corrected

9   after three (3) attempts can the employee be terminated. (Ex.121).  In addition, the Memorandum of

10  Understanding dated November 30, 2018 (Ex.122) between the City and the firefighters Union,

11  requires the City, prior to imposing any discipline,  to sit down with an employee facing discipline

12  and create a written Personal Improvement Plan (PIP)  to address the disciplinary issues.   The

13  employee is then to be monitored and evaluated given the dictates of the PIP for a 12-month period.

14         No progressive, corrective process was afforded to Chief Bathke.  No one sat down with him

15  to create a PIP or to address the perceived issues. Indeed, Chief Bathke was never given the

16  opportunity to correct any perceived deficiencies.  This is despite the fact that once the no confidence

17  vote was brought to Chief Bathke's attention he offered, on at least two occasions, to meet with the

18  Union officers and the City in an effort to address and correct the perceived issues.

19         In fact, Chief Bathke was given no notice whatsoever of any problems with his management

20  style, or on any issues with the Union. Not one complaint was filed against him by the Union or any

21  firefighter, and not one grievance was filed that dealt with his management style or the changes he

22  was implementing.  This is telling given that the Union's firefighters have no problem with filing a

23  grievance if they felt they were shorted even $2 in a paycheck or filing a complaint for such minor

24  things such as having to stay in line to warm their food because the department had only one

25  microwave.  This is also telling because the City has a strict no-retaliation policy.  (Ex.131).  And

26  the Chief conducted monthly Officers' Meetings where an open forum was held in which anyone

27  could raise any issue whatsoever.  Not one complaint or criticism of Chief Bathke was ever made in

28

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
*24411 Ridge Route Ste, 200, Laguna Hills, CA 92653*
*T: (949) 580-3737 F: (949) 580-3738*

1  any of these meetings (Ex.173). Surely, if a firefighter had a true complaint or issue, he would have

2  brought them up in one or more of these meetings.

3      Moreover, absent from Chief Bathke's personnel file is any notice whatsoever that there were

4  problems with his performance or the manner in which he was managing the department. His

5  personnel file was an example of a stellar employee. Finally, the City's policy required the Mayor to

6  provide to the Chief a formal work performance evaluation, each year, on the anniversary date of his

7  employment.  She failed to do this with Chief Bathke.

8      In short, given the absence of any complaints, grievances, or evaluations there is no way the

9  Chief could have any notice that there were issues regarding his management style.  This is even

10 more true since he would confer with the Mayor on almost a daily basis (his office shared a common

11 door with hers) and she never notified him of any issues whatsoever.[2]

12     Because the City did not follow its own "for cause" procedures before terminating Chief

13 Bathke, the City breached the agreement.

14 **B.  The City Failed to Follow the Seven Daugherty Factors that Must be Applied to a Union**

15    **Worker Prior to Termination.**

16     Unlike non-union workers, a union worker is protected by a collective bargaining agreement.

17 Before a union employee can be terminated, the City must employ what is commonly known as the

18 seven Daugherty factors:

19          …the collective bargaining agreement ensures that no officer will be discipline except

20          for "just cause." "Just cause" is a term of art in labor law, and its precise meaning has

21          been established over 30 years of case law.  Whether there is just cause for discipline

22          entails much more than a valid reason; it involves such elements as procedural

23          fairness, the presence of mitigating circumstances and the appropriateness of the

24          penalty… Seven factors are considered in determining whether there was just cause

25

26 _____

27 [2] The City asserts that on Nov. 14, 2018, the Mayor had an informal meeting with the Chief where
   she expressed concern over his management style.  Chief Bathke denies that any meeting took place
28 and will have irrefutable proof that no such meeting occurred.

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
*24411 Ridge Route Ste, 200, Laguna Hills, CA 92653*
*T: (949) 580-3737 F: (949) 580-3738*

for discipline, including whether the employer applied its rules even-handedly, and whether the degree of discipline was reasonably related to the seriousness of the infraction given the employee's record of service. *Civil Service Com'n of City of Kelso v. City of Kelso,* 137 Wash.2d 166,173 (1999).

The seven Daugherty factors were developed in 1964 by the famous arbitrator Carroll Daugherty to establish a single standard to determine if the discipline or discharge of an employee can be upheld under a for cause standard.  These factors are used in many jurisdictions when determining whether discipline should be imposed against a union worker, including Washington. *Civil Service Com'n of City of Kelso v. City of Kelso,* 137 Wash.2d 166,173 (1999). *Logan v. Pierce Cty. Fire Prot. Dist. No. 2,* 126 Wash.App. 1051, F.N. 7 (unpublished); *City of Seattle v. City of Seattle* 230 P.3d 640 (2010); *City of Seattle Police Dept. v. Werner* 261 P. 3d 218  (2011).

The seven Daugherty factors are:

1.   Was the worker given advance warning of the probable consequences of his conduct?

2.  Was the controlling rule, order or standard allegedly violated reasonably related to efficient and safe operations?

3.  Did the employer fully investigate to determine that the employee actually violated the rule?

4.  Was the investigation fair and objective?

5.  Did the investigation uncover substantial proof of guilt?

6.  Was the employer's treatment even-handed and non-discriminatory?

7.  Was the discipline decided fair and reasonable given the gravity of the offense?

Regarding factors 6 and 7 the factors to be considered are:

    a.  Seriousness of the infraction

    b.  Employee's past coaching, discipline

    c.  Employee's length of service

    d.  Employee's total performance record

    e.  Unusual mitigating circumstances

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
*24411 Ridge Route Ste, 200, Laguna Hills, CA 92653*
*T: (949) 580-3737 F: (949) 580-3738*

f.   How does it compare with what has been done in other similar circumstances; will this employee be receiving the same discipline as others who violated this rule or standard?

g.   Does this employee have the worst record of all employees on violation of this rule?

Here, the City's decision to terminate Chief Bathke does not pass muster with any of these factors needed to show that proper cause existed. Chief Bathke was not provided any advance warning of the probable consequences of his conduct. In fact, he had no notice whatsoever. The City has not identified any rule, order or standard that Chief Bathke has violated. Indeed, the independent investigator, Robin Nielsen, concluded that there she could find no violation of harassment or discrimination standards, and when she asked to look into possible work performance issues, she was instructed to stop her investigation.

A full investigation was never completed. For instance, Chief Bathke was never interviewed nor were any witnesses who supported him.  The only witnesses interviewed were those who were labeled as the "moving force" behind the no confidence vote.  Even after they were interviewed the investigator found no malfeasance on the part of Chief Bathke. The investigation was not fair and objective as it only looked at one side. Indeed, neither the City nor the investigator ever spoke with Chief Bathke or anyone on his behalf. A one-sided investigation, by definition, cannot be fair and objective. The investigation produced no proof of guilt. In fact, Ms. Nielsen found the opposite, that there was no evidence of harassment or discrimination.

Finally, the discipline decided was not reasonable given the gravity of the alleged offense. If there were issues between the rank and file union workers and the Chief, then an effort should have been made to sit down and mediate the issues. This is especially true in this case since the Mayor knew that Chief Bathke had a no nonsense, tough personality and was brought in to make significant changes to the fire department. The Mayor knew that making these changes would cause friction, and told Chief Bathke that she would support him, nevertheless. After he did her bidding, she turned her back on him and summarily sentences him to the guillotine.

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
24411 Ridge Route Ste, 200, Laguna Hills, CA 92653
T: (949) 580-3737 F: (949) 580-3738

1    Given the facts of this case, the City did not have the proper cause to terminate Chief Bathke.

2    **C.  <u>The City Uses the Wrong Standard to Determine Whether There was Cause.</u>**

3    The Exempt Employee Agreement between the City and Chief Bathke states that his

4    "employment shall not be terminated by the City except for *"cause", with the grounds therefor to be*

5    *the same as those applicable to the City's union-represented employees.*" (*"emphasis added"*). The

6    City acknowledges this language but simply says its "intent" was "to confirm that the exempt

7    employees were not terminable "at will." (City brief at15/22-23). The City then applies the definition

8    of "just cause" established by *Baldwin v. Sisters of Providence in Washington, 65 Wash.App.93*

9    *(1992)*. This is a fundamental error in the City's analysis.

10    *Baldwin* did not involve union workers. Non-union workers are not provided the same level

11    of protections and rights relating to discipline.  This is because union workers are covered by a

12    collective bargaining agreement which provides these enhanced and significantly greater rights. (See

13    *Civil Service Com'n of City of Kelso v. City of Kelso,* 137 Wash.2d 166,173 (1999) [Collective

14    bargaining agreement requires "much more" than a valid reason to impose discipline]. As discussed

15    above, the "cause" required to discipline a union worker (which Chief Bathke is entitled to) involves

16    an analysis of the seven Daugherty factors as well as affording him the progressive, corrective

17    process. None of these factors applies to the non-union workers that were present in *Baldwin*. As

18    such, the *Baldwin* standard does not apply here.

19    **<u>DAMAGES</u>**

20    Chief Bathke is now 59 years old.  His prospects for employment are dim.  This is

21    compounded by the fact that the City (apparently through Cory Kuhl) leaked to the news media the

22    disparaging Maple Valley Union Letter.  The disparaging statements made were picked up not only

23    by the local media but by the national and international firefighter journals and magazines.  The result

24    is that the Chief has been unable to find any work despite applying to more than 250 jobs. (Ex.143)

25    At this point, it must be concluded that he will be unable to find work in the firefighting industry for

26    the remainder of his work career.

27    This is devasting to Chief Bathke for several reasons. First, he had planned to work with the

28

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
24411 Ridge Route Ste, 200, Laguna Hills, CA 92653
T: (949) 580-3737 F: (949) 580-3738

1  City for at least 10 years (Ex.144).  If he had been able to work for only another three years, then he

2  would have qualified for pension benefits. The City took this away, so that the Chief now has

3  minimum retirement income. He has been made financially destitute.

4       A forensic CPA expert was retained to calculate Chief Bathke's damages.  This was presented

5  in a detailed report, a summary of which is provided below. The conclusion of the expert is that Chief

6  Bathke's economic damages are $1,461,514.

**David W. Bathke**

**v.**

**City of Ocean Shores, et al.**

***Summary of Damages***

Schedule 1

| | | |
|---|---|---|
| Past Lost Salary from Termination Date  Through December 31, 2019 | Schedule 3 | $90,880 |
| Future Lost Salary from January 1, 2020 Through Expected Retirement (discounted to present value) | Schedule 4 | $812,162 |
| Lost Pension Benefits (discounted to present value) | Schedule 5 | $498,486 |
| Past Lost Dental Insurance Benefits from Termination Through December 31, 2019 | Schedule 9 | $1,080 |
| Past Lost Life Insurance Benefits from Termination Through December 31, 2019 | Schedule 9 | $333 |
| Lost Dental Insurance Benefits (discounted to present value) | Schedule 10 | $9,113 |
| Lost Life Insurance Benefits (discounted to present value) | Schedule 10 | $2,785 |
| Forgiveness of Loan (discounted to present value) | Schedule 11 | $66,149 |
| **Total Damages** | | $1,480,988 |
| Total Unemployment Benefits Received by Mr. Bathke | | $19,474 |
| Net After Unemployment Benefits | | $1,461,514 |

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
*24411 Ridge Route Ste, 200, Laguna Hills, CA 92653*
*T: (949) 580-3737 F: (949) 580-3738*

1  Respectfully Submitted:

2

3  DATED: November 12, 2020          **WELLMAN & WARREN**

4

5                          By:    ___/s/ Scott Wellman_____
                                  Scott Wellman, Esq
6                                 24411 Ridge Route, Suite 200
                                  Laguna Hills, CA 92653
7                                 Tel: (949) 580-3737
                                  Fax: (949) 580-3738
8                                 swellman@w-wlaw.com
9                                 Attorneys for Petitioner,
                                  David W. Bathke
10

11 DATED: November 12, 2020          **LAW OFFICES OF LYLY NGUYEN**

12

13                         By:    ___/s/ LyLy Nguyen_____
                                  LyLy Nguyen, SBN 53154
14                                **Law Offices of LyLy Nguyen**
                                  P.O. Box 482
15                                Ocean Shores, WA 98569
                                  Tel: (360) 633-8880 Fax: (714) 388-3890
16                                lyly@lylylaw.com
17                                Attorneys for Petitioner,
                                  David W. Bathke
18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

I hereby certify, under penalty of perjury, under the laws of the United States of America

3

that on this date, I caused to be electronically filed the foregoing document, and this Certificate of

4

ECF Filing & Service, with the Clerk of the Court using the CM/ECF system, who will send

5

notification of such filing to the following party:

6

7

8

**<u>Attorney for Defendants</u>**

9

Elizabeth A. McIntyre, emcintyre@lldkb.com
Brent Dille, brent@dillelaw.com

10

11

DATED this 12th day of November, 2020, at Laguna Hills, California.

12

13

14

*/s/ Kelsey Krueger*
Paralegal

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Law offices of Wellman & Warren*
*Scott Wellman, Esq.*
*24411 Ridge Route Ste, 200, Laguna Hills, CA 92653*
*T: (949) 580-3737 F: (949) 580-3738*