1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DAVID W. BATHKE,

               Plaintiff,

    v.

CITY OF OCEAN SHORES,

               Defendant.

CASE NO. C19-5338 BHS

DECISION, FINDINGS OF FACT,
AND CONCLUSIONS OF LAW

## DECISION

Plaintiff David Bathke ("Bathke") had planned to finish his 40-year career in the fire service industry by taking the position of fire chief in the small Washington coastal town of Ocean Shores ("the City"). For the reasons of job security, before he accepted the offer of this position that was extended to him by Mayor Crystal Dingler ("Dingler"), he requested assurance that he would be provided employment security protections. Dingler gave him this assurance by referring him to written documents that would apply to his employment with the City. These included: (1) the collective bargaining agreement the City had with its exempt employees, the Exempt Employees Agreement ("EEA"); (2) the

1    City Personnel Manual ("PM"); (3) the City's collective bargaining agreement with its

2    firefighters ("CBA"); and (4) the Standard Operating Guideline 2000:00 ("SOG").

3         While the City and Bathke disagree as to the effect of these documents on the

4    interpretation of the "for cause" standard for employment termination, there is accord that

5    these documents together constitute an employment contract and that "for cause" is the

6    standard Dingler should have relied upon in making any decision to terminate Bathke's

7    employment. No matter which interpretation the Court adopts, the standard of "for cause"

8    entails the requirement that, when an employer makes a termination decision, that

9    decision much be actuated in good faith which means that the employer must provide the

10   employee procedural fairness. *See Lambert v. Morehouse*, 68 Wn. App. 500, 505 (1993)

11   (citing *Gaglidari v. Denny's Rests.*, 117 Wn.2d 426, 437 (1991)). In her attempt to meet

12   this requirement, Dingler failed. The City breached its contract with Bathke, and he is

13   entitled to damages.

14        During the recruiting process, Bathke was told by Dingler the fire department

15   needed a strong leader to address issues within that organization. It was understood that

16   implementing changes would present some challenges. And Bathke implemented several

17   changes, many of which some firefighters disagreed with. Even so, for the nearly year

18   and a half that Bathke held the position of fire chief, no complaints were lodged by any

19   firefighter or Dingler about his performance.

20        Bathke began his employment in the position of fire chief for the City on June 12,

21   2017 after approximately one month of consulting work with the City. He maintained a

22   probationary employee status for his first six months. Bathke's probation ended, and

Dingler sent him a letter confirming his permanent status as fire chief on November 12, 2017, in which Dingler said, "I am impressed with your leadership skills and style and look forward to a long career for you here in Ocean Shores."

It was not until December 13, 2018 when Dingler met with members of the firefighters' union that any firefighter communicated a complaint about Bathke's performance as fire chief to Dingler, Bathke's supervisor. The firefighters' union had taken a no confidence vote as to Bathke's leadership on December 10, 2018, and all who were in attendance voted in favor of no confidence. On December 13, 2018, the union members presented Dingler and Human Resource Specialist Dani Smith ("Smith") a list of complaints that had first surfaced at a firefighters' union meeting three days earlier; the complaints were summarized in meeting notes taken by Smith. On the day following her meeting with the firefighters, December 14, 2018, Dingler apparently accepted these complaints at face value—without seeking any response or information from Bathke or conducting an independent inquiry—and placed him on administrative leave with pay. On February 8, 2019, Bathke's status was changed to unpaid administrative leave.

It is significant that the fire department leadership, consisting of the chief, captains, and lieutenants, met monthly to discuss current issues and problems within the department. Minutes were taken of these meetings, and none of the complaints that were later detailed by certain firefighters at the no confidence vote were documented at the monthly meetings; the reason for which is that they were not likely raised, as Bathke contends. Though there are provisions in City policies for the making and processing of complaints or grievances, not one of the complaints communicated to Dingler by the

firefighters were ever made or pursued in accordance with these policies. Additionally, though a provision in the PM, ¶ 5.410(c), provided that every employee was to be evaluated at least once a year, Dingler, as Bathke's supervisor, never performed such an evaluation. Bathke had no reason to suspect that his job performance was in any way viewed by members of the department or Dingler as deficient.

At Dingler's request, Firefighter and Local 2109 President Corey Kuhl sent Dingler an email on January 7, 2019 laying out the list of complaints the union had identified in connection with Bathke's performance as fire chief. The list overlaps with some of the complaints stated in Dingler's pre-termination letter but also contains allegations not in that letter or in Notice of Disciplinary Decision.

The City then engaged Robin Nielsen ("Nielsen"), an outside investigator. She visited the City on January 9, 2019 to determine whether Bathke had committed any discriminatory acts or created a hostile work environment. She interviewed only six firefighters. She did not interview Bathke. On January 11, 2019 Nielsen orally communicated her initial findings to the City—that she found no evidence of any unlawful discrimination, harassment, or a hostile work environment. She did indicate there may be some performance issues with Bathke, and she inquired as to whether the City wanted her to further her investigation into those issues. On January 15, 2019, the City informed Nielsen that no further investigation by her was desired and that no formal report to the City on her findings was necessary.

On the very next day, January 16, 2019, Dingler, without conducting any interview of Bathke or undertaking any investigation to explore the firefighters'

allegations, sent a letter to Bathke informing him that he had "lost the trust and respect of the members of your department" and that she could "see no path forward" for him to continue as chief of the fire department." In the letter, Dingler offered Bathke four months of severance pay in exchange for his resignation. Remarkably, there were scant details in that letter setting out specific complaints. Dingler did indicate that she would like to "sit down and talk" with Bathke after January 28, 2019. As invited by Dingler, Bathke employed legal counsel, Scott Wellman, who sent a letter to the City on Bathke's behalf on January 23, 2019. The letter rejected the City's offer and suggested a solution through a mediation process. This proposal was in turn rejected, there was no further consideration of having a meeting between Dingler and Bathke, and instead the City provided notice of a *Loudermill* pre-disciplinary hearing along with a Summary of Charges on February 13, 2019.

The pre-disciplinary hearing was conducted on March 12, 2019. Other than a brief opening statement by attorney Wellman on Bathke's behalf, the 3.5-hour long hearing consisted mostly of Bathke addressing in narrative fashion each of the complaints stated in the summary of charges letter to Bathke. During the period between the placement of Bathke on administrative leave and the pre-termination hearing, there were at least three documents that set out complaints regarding Bathke's performance in his position of fire chief: (1) the notes taken by Smith of the December 13, 2018 meeting involving Dingler, Kuhl, Captain Matt Krick, and Smith; (2) the January 7, 2019 email from Kuhl to Dingler; and (3) the February 13, 2019 Notice of Pre-Disciplinary Hearing.

In arriving at its decision in this case, the Court is confining its analysis to those complaints that were presented in the Notice of Pre-Disciplinary Hearing, some of which were sustained and became the basis of Dingler's decision to terminate Bathke's employment as presented in the Notice of Disciplinary Decision. It is important and relevant to set out the charges included in the Notice of Pre-Disciplinary Hearing showing not just those charges that were sustained but those that were not sustained or were abandoned.

In the interest of organization and simplicity the following is a chart setting out a description of each complaint Dingler cited in her Notice of Pre-termination Hearing, Bathke's response at the hearing, and Dingler's conclusions and decision.

| City's Summary of Charges | Bathke's Response | City's Conclusions |
|---|---|---|
| **1. Failure to Establish Trust and Confidence Among Staff.** | | |
| Engages in bullying, intimidation, and favoritism; displays anger; and is narcissistic. | Denies pattern of abuse. There were no complaints or grievances ever filed regarding abuse. Contends that these are false accusations—that he was the one who implemented an emphasis on anti-harassment. Cited need to bring order. Provided details of need for strong leadership that incurred resistance and cited praise given to employees. | Found behavior could "reasonably be construed as bullying or abusive." There was "significant degradation of trust and respect in the department." |

| 2. Poor Judgment and Decision-Making with Respect to Purchases and Expenditures. | | |
|---|---|---|
| E71 Top Mount Generator: Purchased at more cost than the unit it replaced, and the unit was incapable of remote start. Did not consult firefighters. | E71 Top Mount Generators: Complaint was based upon erroneous report that he spent $4000 to $5000 when, in fact, the generator cost under $1000—less than the one it replaced. Could not fit the generator that would be its factory replacement that had remote start. | E71 Top Mount Generators: Accepted the explanation about the false reporting on higher expense but still disapproved failure to get one with remote start. |
| Portable Inverter Generators: Purchased Paladin generators from company going out of business with no recourse—bought "as is." | Portable Inverter Generators: False allegation. Company not going out of business, but rather taken over by Honeywell. And was a good deal: 4 generators for $1500. | Portable Inverter Generators: One generator already broken and no recourse. |
| Bunker Gear: New Bunker Gear poorly fitting and of marginal quality. Got a "kick-back" from vendor. | Bunker Gear: False allegation regarding "kick-back." Each firefighter fitted with high quality meeting national standards. No one ever complained. | Bunker Gear: "Kick-back" explanation accepted. Still had complaints that the gear was uncomfortable and poor fitting. |
| Plastic Intubation Devices; Aladtec Software; Fire Suppression Foam; Ladder; Zoll Maintenance Agreement for AED's: These were lumped together because they had a common theme; the employees' input was not considered. The Zoll maintenance agreement was allowed to lapse. | Plastic Intubation Devices; Aladtec Software; Fire Suppression Foam; Ladder; Zoll Maintenance Agreement for AED's: Explanations for each given. The allegations about suppression foam and ladder are false. He didn't purchase either. Allegation was made about his purchasing suppression foam. The Zoll maintenance agreement allegation is false. It was not allowed to lapse. | Plastic Intubation Devices; Aladtec Software; Fire Suppression Foam; Ladder; Zoll Maintenance Agreement for AED's: No contrary findings to Bathke's responses on his assertion of false allegations. Did find that the ladder and airway devices were "problematic products for one reason or another." |

| 3. Failure to Comply with Policies and Legal Requirements in Personnel Matters | | |
|---|---|---|
| Disciplinary Proceedings Involving FF Schmitz: Failure to follow disciplinary policies. | Disciplinary Proceedings Involving FF Schmitz: After initial fact-finding meeting with union representation, the next day legal counsel was brought in. Bathke followed advice and guidance of Human Resources Specialist and Attorney. This was second incident requiring discipline. No complaint had been made by the Mayor of handling until the Notice of Pre-termination Hearing. | Disciplinary Proceedings Involving FF Schmitz: Accepted defense except the process before involving H.R. and Attorney. Implied breach of attorney-client communications in presenting response. (It was never explained by Dingler in the letter of termination or at trial how this was a violation.) |
| Requiring FF Frank to come in early to work out; changes to shift: Violated union contract by initially placing FF Frank on a 40-hour work week. FF Frank was not paid overtime. | Requiring FF Frank to come in early to work out; changes to shift: Followed past practice with new employee for orientation purposes. Frank was paid overtime. This was a false allegation. | Requiring FF Frank to come in early to work out; changes to shift: Explanation accepted; but should have discussed with union in advance. Apparently accepted the overtime defense. |
| Failure to Comply with Pre-Employment Medical Examination: Improper requirement for testing for sexually transmitted disease when bringing on a volunteer EMT. (Remaining general allegation unclear). | Failure to Comply with Pre-Employment Medical Examination: A firefighter expressed concerns about the appropriateness of taking on a woman about whom there were concerns on her background. Sought guidance from HR Specialist Smith. Did not order a test, and no test was performed, though a drug test is authorized by a policy in the Employee Manual after reportable injury involving City | Failure to Comply with Pre-Employment Medical Examination: Apparently, response accepted. But new concern raised regarding requiring a drug test upon a firefighter that had fallen "from the hulk." The post-accident drug testing allegation regarding the "hulk" was not specifically included in Dingler's pre-termination letter. Dingler did not explain why post-accident testing would be improper |

ORDER - 8

| | | |
|---|---|---|
| | property and is not "random testing." | or in violation of City policy. |
| <u>Hiring a friend from Wisconsin over the Fourth of July:</u><br>Hired a friend for extra coverage on holiday "rather than allowing one of your seasoned Fire Captains to be in charge of the station." Friend paid more than others and did not know procedures. | <u>Hiring a friend from Wisconsin over the Fourth of July:</u><br>False allegation. FF Travis Bearden was in charge of scheduling for Fourth of July. He made the assignments. | <u>Hiring a friend from Wisconsin over the Fourth of July:</u><br>Explanation was accepted except that still concerned about lack of knowledge of the community. |
| <u>Use of City staff for personal errands and jobs:</u><br>Hired a City employee to paint house interior and paid by giving a rifle as payment rather than actual monetary payment; used Active 911 to solicit employee help in move; used an on-duty employee to deliver piece of exercise equipment to home. | <u>Use of City staff for personal errands and jobs:</u><br>Had an employee, who does house painting on the side, to do some interior painting. The painter wanted extra money to buy a rifle. Bathke offered a rifle as part of the payment, and it was accepted. False statement about using 911 to solicit moving help. Doesn't have access to 911 system. He used the Aladetec system which is use for personal communications as well scheduling. The exercise equipment was won at a firefighter's auction. FF Kuhl told Bathke if Bathke won it he would deliver it. | <u>Use of City staff for personal errands and jobs:</u><br>No mention in termination of the painting episode. Accepted explanation of delivery of exercise equipment. Still reported use of 911 to solicit moving, but even if Aladtec, should not be used by employees to help move. (No policy or rule cited as constituting a violation). |
| <u>Grievances:</u><br>Union grieved Bathke's personnel decisions more than prior leadership. Examples, discipline of FF Schmitz and FF Franks working a 40-hour week. | <u>Grievances:</u><br>Not addressed beyond the response in Charge 3. | <u>Grievances:</u><br>Not addressed beyond the decision in Charge 3. |

| Breaking the Chain of Command: Captains complain that Bathke directly supervises lieutenants. | Breaking the Chain of Command: Not discussed. | Breaking the Chain of Command: Not discussed. |
|---|---|---|
| **4. Failure to Respond Promptly or Properly to Calls** | | |
| Failure to respond to fatality fire until after the scene had cleared. Didn't debrief firefighters. Several agencies present to assist fire department but Bathke only present after event over. Bathke failed to debrief responders. | Failure to respond to fatality fire until after the scene had cleared. Didn't debrief firefighters. Was present as demonstrated by photo Bathke took of firefighter at the scene using a hose to extinguish fire. Captain Krick, as incident commander, was responsible for debriefing. | Failure to respond to fatality fire until after the scene had cleared. Didn't debrief firefighters. Only present at mop up stage. Should have debriefed firefighters, not just by Captain Krick. |
| Response to Tsunami Warning. Staff had difficulty reaching Bathke concerning the tsunami warning and he was not aware of steps to be taken. | Response to Tsunami Warning. Bathke was present. | Response to Tsunami Warning. Explanation accepted, except Dingler said "as I recall, you were not versed in our tsunami protocols." |
| **5. Disrespectful Comments** | | |
| Made statement about having council member. Bathke had been heard boasting that he had a council member in his pocket. | Made statement about having council member. Bathke said he had the vote of a council member in his pocket regarding a rate increase. | Made statement about having council member. Clarification accepted but still regarded as "lack of decorum." |
| Bathke responded negatively in connection with an issue involving Lt. Kuhl. Manner was abrasive, counterproductive and "reflected poorly on our agency." | Bathke responded negatively in connection with an issue involving Lt. Kuhl. Lengthy explanation given. | Bathke responded negatively in connection with an issue involving Lt. Kuhl. Not included as basis for decision to terminate. |

| 6. Dishonesty | | |
|---|---|---|
| False statement attributed to Mayor. Mayor did not order Bathke to purchase a new command vehicle as Bathke asserted. | False statement attributed to Mayor. False. Bathke told others that Mayor said to keep the command vehicle in the budget. | False statement attributed to Mayor. Not included as basis for termination. |
| False statement made to Dani Smith regarding Fire Inspector. Dingler did not know about the demotion. | False statement made to Dani Smith regarding Fire Inspector. Told Dingler about it in a meeting and she was copied on email concerning the subject. | False statement made to Dani Smith regarding Fire Inspector. Dingler still unhappy about handling of the matter and that Bathke said that the mayor supported the action. |

The forgoing table reflects that many of the complaints that made up the February 23 letter to Bathke were either not sustained, were abandoned, or were substantially accepted by the Mayor based on Bathke's response to them. Despite this, on March 22, 2019, the City gave Bathke an official notice that he was terminated from his employment.

In reviewing Dingler's actions, the Court is not permitted to substitute its view of whether Dingler's decision to terminate Bathke's employment was the correct one. Instead, the Court is charged with determining whether "at the time plaintiff was dismissed defendant reasonably, in good faith, and based on substantial evidence believed plaintiff had [committed the violations]." *Gaglidari*, 117 Wn.2d at 438.

Although Dingler may have attempted to be objective in her findings and ultimate conclusions, her deliberative process was infected by an unfair process leading up to the pre-termination hearing. When she wrote the letter proposing his resignation, she

appeared to have made up her mind that Bathke's employment was going to end. It was

contrary to best practices for her to be both the investigator and the decision maker.

Dingler made no attempt to delve into the individual complaints but accepted them at

face value as reported to her by the firefighters; she could have sought out other

witnesses and City documents that were relevant to issues. She did not do anything more

before the pre-termination hearing than rely on what turned out to be, in many cases, the

firefighters' inaccurate, misleading, or incomplete reports and allegations. Even more

astonishing is that her investigation did not include an interview with Bathke or an

opportunity for him to provide evidence until the pre-disciplinary hearing itself. This

course of action also was a violation of standards for pre-disciplinary investigations in the

employment arena according to the expert testimony of Deborah Diamond. Dingler's

actions and omissions, if viewed separately, might not constitute sufficient evidence of an

unfair process. But, taken as a whole, the cumulative effect of these rendered the decision

to terminate as the product of an unfair process and, thus, as a legal matter made in bad

faith.

       Although the claim in this lawsuit is one for a breach of contract, there was not a

formal employment agreement. Instead the contract that was breached consists of four

City documents, which are relevant to the Court's inquiry. Those documents are: (1) the

PM; (2) the EEA; (3) CBA; and (4) SOG. What all have in common is that an employee

may only be discharged "for cause." The EEA provided that the standard for "just cause"

is to be "cause with the grounds therefore the same as those for union represented

employees." Bathke argues that, in the union context in the State of Washington, the

1    Daugherty factors, which were originally presented in 1964 by arbitrator Carroll

2    Daugherty and were endorsed in *Civil Service Commission of City of Kelso v. City of*

3    *Kelso*, 137 Wn.2d 166 (1999), apply. This argument is persuasive. Dingler confirmed this

4    understanding in her deposition:

5         Q: (Plaintiff's Counsel) Meaning that not only would you have to
          satisfy what constitutes cause in the personnel manual, but you would have

6         to satisfy what constitutes cause in the –for—firing a union-represented
          employee; am I right?

7
          A: (DINGLER) This—yes, I believe that's true.
8
          Q: And he was to be treated as far as being fired the same as a union-
9         represented employee; am I right?

10        Defendant's Counsel: I will object to the form.

11        A: Okay, I believe that's true according to this document [referring
          the EEA], yes.[1]
12
     Dingler's answer further informs the question of what was intended by the party
13
     who drafted these documents and was charged with implementing the agreement. While
14
     the language of the EEA states "Employees' employment shall not be terminated by the
15
     City except for 'cause'", with the grounds therefor to be the same as those applicable to
16
     the City's union represented employees . . . ", it is fair to read this arguably ambiguous
17
     language, as Dingler did in her testimony, to regard the term "grounds" as implicating the
18

19

20        [1] While the PM at Section 9.810(a) provides, "Although the City normally follows these
     conditions and procedures, the City retains the right to deviate from them as it deems necessary
21   at is sole discretion," the City has not invoked or argued the applicability of this section to the
     Bathke termination. Rather, it has acknowledged that the standard for review of his termination
22   is "for cause."

1    protections of the City's collective bargaining agreements. Arguably, this would include

2    the application of the Daugherty factors when analyzing those grounds.

3          However, the outcome of the case does not depend upon whether the "for cause"

4    standard includes the Daugherty rubric because this standard even without such a rubric

5    "entails much more than a valid reason; it involves such elements as procedural fairness,

6    the presence of mitigating circumstances, and the appropriateness of the penalty." *City of*

7    *Kelso*, 137 Wn.2d at 173. Here there was a lack of procedural fairness. Had the City

8    performed a reasonable investigation before Dingler sent the Notice of Pre-Disciplinary

9    Hearing (or even before the Pre-Termination Hearing), beyond taking the firefighters'

10   complaints as wholly credible, there is reason to believe the outcome would have, or

11   should have, been different.

12         The Court does not find that Dingler's decisions in this case were motivated by

13   malice or bias. These need not be established for the Court to conclude that the

14   termination process was not conducted in good faith. After hearing testimony in six days

15   of trial, listening to the audio recording of the pre-termination hearing, and reviewing the

16   admitted documents, the Court concludes that Bathke was not procedurally treated fairly.

17   It is not important that Dingler may have intended to provide a fair process, the record as

18   a whole demonstrates that it was not.

19         Bathke was blind-sided, without any prior notice or warning of the no confidence

20   vote that was suddenly followed with Bathke being placed on administrative leave.[2] An

21

22   _____
      [2] Dingler testified that she informed Bathke that there was the possibility of a no
      confidence vote within a day of learning about the vote from Smith. She could not testify as to

attempt was made to conduct an investigation through an outside investigator, but when Nielsen found no evidence of discrimination or harassment, she was relieved of any further obligation to investigate, though she identified that there might be some performance issues.

At Dingler's request, the union president sent the January 7, 2019 memo outlining the union's complaints. More troubling is that the memo included an attachment that in trial was referred to as the Maple Valley letter.[3] This document had been kept, not as a public document as part of the recruitment process, but by the union president to hold and bring out at the union meeting that resulted in a no confidence vote. It can only be conjecture that this document served its purpose to bolster the credibility of the

---

the specific date of the meeting but believed "it was a couple weeks before" the December 13, 2018 meeting with Captain Krick and Lt. Kuhl. Smith testified that she told Dingler about the potential no confidence vote on November 14, 2018. Bathke, however, testified that he was out of state on November 15, 2018, which would logically be the day Dingler informed Bathke about the no confidence vote based on her and Smith's testimonies. Bathke testified that, in fact, he was never told by Dingler or anyone of the possible no confidence vote prior to that vote.

Dinger testified that Bathke seemed surprised when she informed him of the no confidence vote after it occurred. Because the date of the alleged meeting was clearly wrong and because Bathke seemed surprised, suggesting he was learning about the vote for the first time, the Court finds that, while there may have been a meeting of some nature at some time between Bathke and Dingler, there is insufficient evidence to find that Bathke had information about the impending no confidence vote. Further, even if such a meeting occurred with notice of the possible vote, this would not qualify as a warning under the City's progressive discipline policy. Neither Dingler or Smith characterized the passing of the information as a disciplinary warning and no written documentation was made of the alleged "warning" as required by the SOG 2000 and "recorded in his/her personnel manual" pursuant to the Collective Bargaining Agreement between Teamsters Local and City of Ocean Shores.

[3] The Maple Valley letter originated from the Maple Valley, Arizona firefighters' union and described Bathke as being deceitful, dishonest, and a snake. Lt. Kuhl physically gave the letter to Dingler and later emailed it to her.

firefighters' complaints and persuade Dingler that the only option available to her was to replace their supervisor.

## Progressive Discipline

Bathke argues that Dingler was "mandated" but failed to provide the progressive discipline processes set out in the PM, the CBA, and SOG 2000. The flaw in this argument is that each progressive step of discipline, as outlined in these documents, is not necessary for the City to impose the ultimate discipline of termination. The City retains the right to terminate employment for just cause if the gravity of the offense is sufficiently severe.

## Damages

Bathke is entitled to an award of damages as a result of the City's breach of contract. Reinstatement is not requested and, in any case, would not be a viable remedy in the situation that is present here involving a top management position. The calculation of damages was presented through the testimony of CPA David S. Hanson ("Hanson"). The City did not rebut through expert testimony Hanson's method of calculating damages but challenges the assumption in the calculation that Bathke is, and will remain, unemployable for the ten-year period that Bathke expected to be employed at the City until his planned retirement. The Court accepts Hanson's methodology.

Bathke testified that he has vigorously sought employment, almost exclusively in the fire service, without success. He supported this contention with a log he produced reflecting applications made to employers for a total of 254 positions from February 7, 2019 through November 8, 2020.

The City, however, challenged the assertion that he has thoroughly exhausted his possible opportunities through all the available openings posted in the trade publications Daily Dispatch and firejobs.com. The City pointed to several openings posted in the Daily Dispatch in the fall of 2020 for which Bathke did not apply.

The Court finds that Bathke took reasonable steps to secure employment in the fire service and made some effort to seek work in related fields. However, the Court cannot conclude from the evidence submitted at trial that Bathke is wholly unemployable and has been forced to an early retirement without prospects for obtaining any gainful employment. His education, training, skills and experience in management provides marketable skills in many fields of employment. If he were to seek employment with employers in need of middle management, he is likely at some time to be successful.[4] Even so, he lost a very well-paying position with benefits, as described in Hanson's testimony. Because it may take some additional time and effort for Bathke to secure solid and stable employment at a position that is likely going to be less remunerative, the Court finds that the total net present value of his lost future income is 50% of the amount calculated by Hanson. Similarly, whether any such future employment would entail Washington State retirement benefits is uncertain but quite possible; especially since Bathke would have the incentive of seeking employment that would continue his

---

[4] In post-trial briefing, Bathke volunteered (after the close of evidence presentation) reducing the loss of future income by $19,718 representing income Bathke earned at a temporary position with the California Medical Assistant Teams in connection with setting up a temporary field hospital for COVID-19 patients. This evidence, accepted by the City and the Court, supports the Court's conclusion that he remains employable.

1    participation in a Washington State administered pension fund. Therefore, the Hanson

2    figure is also reduced by 50%.

3         The loss calculated by Hanson of future earnings, pension and benefits totals

4    $1,414,839, reduced by half, and less the $19,718 Bathke earned in a recent temporary

5    position and $19,474 he received in unemployment benefits equals $668,227.50. In

6    addition, Bathke has established that by losing this position he also likely lost the

7    opportunity to have his educational loan forgiven. This amount was calculated to be

8    $66,149 after being discounted to present value. The total damages awarded to Bathke is

9    $734,376.50 representing the sum of the lost future income, benefits and loan

10   forgiveness.

11        As the prevailing party, Bathke seeks an award of his reasonable attorney's fees,

12   citing RCW 49.48.030 as interpreted in *International Association of Fire Fighters, Local*

13   *46 v. City of Everett,* 146 Wn.2nd 29 (2002). The City correctly argues that the EEA,

14   which forms part of the employment contract with Bathke, contains the provision that,

15   "The City and Employees shall each be responsible for their own attorney's fees in any

16   Court action or arbitration proceeding involving this Agreement." This is an enforceable

17   provision. Bathke's request for an award of attorney's fees is denied.

18        In addition to the foregoing, having heard and reviewed the testimony of the

19   witnesses, the evidence of records, and the contentions and arguments of counsel, the

20   Court, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, makes

21   supplemental findings of fact and conclusions of law as follows:

22

**FINDINGS OF FACT**

1.      On March 4, 2017, Plaintiff David Bathke applied for a job as Fire Chief for the City of Ocean Shores.

2.      As part of the hiring process Mayor Dingler asked that lieutenant Corey Kuhl conduct a background investigation regarding Bathke.

3.      Prior to being hired, Bathke had several conversations with the Mayor. The Mayor explained that the City's fire department faced multiple challenges as it has been without a fire chief for a number of months. These challenges included excessive overtime, operating over budget, the City needed to save the positions of seven of its full-time fire fighters, the crew needed to be held accountable, they needed to bring in new digitized record management systems, they needed new safety training, they needed to obtain new equipment, and they needed to negotiate a new union contract.

4.      When Bathke interviewed with the City of Ocean Shores, Mayor Dingler had two internal applicants apply for the fire chief position but she did not hire from within. Mayor Dingler testified that she wanted to hire a strong leader to handle these challenges.

5.      Bathke was concerned about job security when he was seeking employment at Ocean Shores. He was 56 years old and would be moving from Arizona to Washington and the changes he would be making may not be popular. He told members of the interview panel which included Mayor Dingler that "this is it" for him and agreed to commit to 10 years as fire chief.

6.      He knew that the Mayor supervised department heads and he was concerned about a change in leadership after the next election if a new mayor were elected. He discussed these concerns with Mayor Dingler. Rather than providing Bathke with his own specific contract, she emailed Plaintiff the Exempt Employees Agreement that the City uses for all exempt employees, which she stated was "favorable to them."

7.      On April 13, 2017, Mayor Dingler emailed a copy of the Exempt Employee Agreement and Exempt Employee Salaries to Bathke. She directed Bathke to the City's website to look at the four union contracts to look at their disciplinary procedures. Based upon his discussion with Mayor Dingler, Bathke understood that as an exempt employee, he had the same corrective, progressive, discipline rights as all of the other collective bargaining units, fire, police, public works, and clerical.

8.      The City uses a corrective, progressive discipline process. This policy is contained in each of the following:

   a.  2014 City Personnel Manual;

   b.  2018 City Personnel Manual; and

   c.  Standard Guide 2000.1 of the City's fire department.

9.      During trial, both Mayor Dingler and HR Specialist Dani Smith testified that the City utilizes a progressive, corrective discipline policy.

10.     The position of Fire Chief for the City of Ocean Shores is included among positions in the City that are subject to an agreement known as the EEA dated April 27, 2009. This agreement predated Bathke's employment with the City. This agreement was provided to plaintiff as the agreement that would govern his employment with the City.

ORDER - 20

Bathke understood it was drafted by the City. Attached as part of the Exempt Agreement

is The Memorandum of Understanding between the City of Ocean Shores and the

Exempt Employees of the City of Ocean Shores. This MOU was signed by Mayor

Crystal Dingler for the City of Ocean Shores on July 25, 2014. Contained in this MOU

are the following terms: "WHEREAS, the members of the *Exempt Employees bargaining*

*unit* have agreed to contribute at a higher rate toward their health and welfare benefits.

Now, therefore, the parties agree to modify the terms of the 2009 *Exempt Employees*

*collective bargaining agreement* as follows . . . ." (emphasis added).

11.     The Exempt Employee Agreement contained the following language:

Initial and Extended Term [s] of Agreement. This Agreement shall continue
until modified or terminated as set forth below. During the said period, and
during any extensions thereafter, Employees' employment shall not be
terminated by the City except for "cause", with the grounds therefor to be
the same as those applicable to the City's union-represented employees,
including provisions relating to any reduction-in-force.

12.     The City of Ocean Shores has four groups of union-represented employees:

Fire department employees represented by Local 2109 of the International Association of

Firefighters ("IAFF"); and Police, Clerical, and Public Works employees. The bargaining

agreements for all four bargaining units require "cause" for discipline. Each agreement

requires that all allegations of wrongdoing be timely, thoroughly, and fairly investigated.

The agreements also require that any discipline be subject to a progressive, corrective

process where the employee is counseled and given the opportunity to correct any

perceived defective conduct or behavior.

13.     The personnel manual at the time Bathke was hired was dated 2014. In August 2018, the City adopted a revised Personnel Manual.

14.     Bathke's personnel file did not contain any complaints, write-ups, or evidence of workplace issues.

15.     Bathke never had a performance review during the time that he served as the City's fire chief.

16.     During the time that Bathke was the fire chief, he held monthly Officers meetings and quarterly Safety Meetings. These meetings contained an open Round Table Segment that allowed the firefighters to voice any concerns or complaint. Minutes were kept of all of these meetings. The minutes do not reflect any complaints or concerns about Bathke's management decisions, his management style, or any equipment purchase decisions.

17.     There is no evidence of any complaint made against Bathke's management decisions, his management style, or equipment purchase decisions despite the fact that the City maintains strict non-retaliation policies, Ocean Shores Personnel Manual: 1.050 Work Place Harassment, and 8.765 Complaint Procedures, and OSFD O.D. 2000.02, Open Reporting of Workplace Risk, Wrongdoing, or Harassment, which promotes the free expression of employee complaints or concerns.

18.     On December 13, 2018, Lt. Kuhl and Capt. Krick met with Mayor Dingler and Dani Smith and advised them that the union had taken a vote of no confidence in Chief Bathke at the previous union meeting on December 10, 2018. Lt. Kuhl presented the Maple Valley letter as part of the complaints the union members had against Bathke.

1   They stated that if she did not do what they asked they would take it to the "press and

2   news."

3        19.    On December 14, 2018, Mayor Dingler placed Bathke on paid

4   administrative leave and had him escorted off of the City's property.

5        20.    After Bathke was placed on administrative leave, the damaging Maple

6   Valley letter was placed in his personnel file and was provided to the public.

7        21.    After Mayor Dingler placed Bathke on administrative leave, Mayor Dingler

8   and Dani Smith met with 12 fire department employees (11 firefighters and

9   administrative assistant Courtney Beebe), who described their feelings when they met

10  with Mayor Dingler. Including volunteer firefighters (i.e., non-union firefighters), the

11  City's department consisted of about 30 firefighters.

12       22.    Prior to the being placed on administrative leave, Bathke had no notice or

13  knowledge that there were major issues between him and the union.

14       23.    The Mayor headed the investigation of the allegations made against Bathke.

15  However, in conducting the investigation, neither she or anyone on behalf of the City (1)

16  spoke to Bathke; (2) spoke to any witnesses on his behalf; and (2) nor viewed any

17  documentary evidence on Bathke's behalf. Mayor Dingler's investigation was limited to

18  speaking to some of the union firefighters.

19       24.    In early January 2019, the City hired a workplace investigator, Robin

20  Nielson, to investigate the reasons behind the no confidence vote.

21       25.    The agreement with Nielson specifically stated that she was to investigate

22  the reasons behind the no-confidence vote.

26.     Nielson never spoke to Bathke or anyone on his behalf.

27.     The Mayor concluded her investigation by January 16, 2018. The City declined to have Nielson prepare a report. The Mayor never spoke to Nielson about her findings or conclusions. By the time Mayor Dingler concluded her investigation, she was aware of the Officers Meetings minutes that were available in writing, but she did not review them to see if any of the allegations by the union members were true or false.

28.     On the same day, the City informed Nielson to cease her investigation, and Mayor Dingler emailed a letter to Bathke informing him that she did "not see a path forward for him" and presented him with a separation agreement and a draft resignation letter. The letter also stated that Bathke may consult with an attorney.

29.     In response to this letter, Bathke hired an attorney who presented the City with a letter suggesting that the parties attempt to mediate the situation so that Bathke could return to work. The City did not respond this request.

30.     The City did not attempt to put together a Personal Improvement Plan or fashion any type of progressive, corrective discipline for Bathke.

31.     After Bathke was put on leave on December 14, 2018 no one from the City contacted him to inform of any wrongdoing he had engaged in for a period of two months when on February 13, 2019 the City presented him with a "Summary of Charges."

32.     The Summary of Charges contained allegations from some of the union firefighters.

33.     Other than speaking to the complaining union firefighters, the Mayor did not verify the truth of the allegations made in her summary of charges. The summary of

1   charges contained numerous inaccuracies, but the Mayor did not uncover these

2   inaccuracies as she failed to independently verify the allegations.

3       34.     From the time that Bathke was put on leave on December 14, 2018, not one

4   person or representative from the City ever contacted him to interview him regarding the

5   reasons why he had been put on leave. Bathke had no knowledge of any perceived issues

6   until two months later when the City presented a Summary of Charges.

7       35.     On March 12, 2019, Mayor Dingler served as the hearing officer for

8   Bathke's pre-disciplinary hearing. This was not an evidentiary hearing and no witnesses

9   were permitted according to the City's policy.

10      36.     The pre-disciplinary hearing, which occurred four months after Bathke was

11  put on leave, was the first time that the City heard from Bathke.

12      37.     Employment dispute expert, Deborah Diamond, testified that the pre-

13  disciplinary hearing must never be the first time that the employer hears from the

14  accused. This is, in fact, listed in recognized employment dispute guidelines as one of the

15  ten greatest mistakes. Diamond also testified that the decision maker must be different

16  that the person who investigated this matter. However, the Mayor acted as both the

17  investigator and the decisionmaker.

18      38.     On March 22, 2019, the Mayor issued her decision terminating Bathke's

19  employment with the City.

20      39.     Since being fired, Bathke has applied for more than 250 jobs. These include

21  not only both executive and non-executive positions in the fire fighting and emergency

22

management system industries but also in industries unrelated to these industries. They

also include jobs throughout the country.

40.     Despite applying for such jobs, Bathke has not been able to find another

full-time permanent job.

41.     By being fired, Chief Bathke not only lost his annual salary and health

insurance, but also benefits including retirement benefits and benefits relating to

forgiveness of student loans.

42.     The amount of damages incurred by Chief Bathke total $780,523. This

consists of the following:

| | |
|---|---:|
| Past Lost Salary from Termination Date Through December 31, 2019 | $90,880 |
| Future Lost Salary from January 1, 2020 Through Expected Retirement (discounted to present value) | $812,162 |
| Loss Pension Benefits (discounted to present value) | $498,486 |
| Past Lost Dental Insurance Benefits from Termination Through December 31, 2019 | $1,080 |
| Past Lost Life Insurance Benefits from Termination Through December 31, 2019 | $333 |
| Lost Dental Insurance Benefits (discounted to present value) | $9,113 |
| Lost Life Insurance Benefits (discounted to present value) | $2,785 |
| Total Future Lost Salary, Pension, and Insurance Benefits | $1,414,839 |
| Less 50% Discounted Rate of Future Lost Salary, Pension, and Insurance Benefits | $707,419.50 |
| Forgiveness of Loan (discounted to present value) | $66,149 |
| Total Damages: | $773,568.50 |
| | |
| Less Unemployment Benefits Received | $19,474 |
| Net After Unemployment Benefits | $754,094.50 |

| | | |
|---|---|---|
| Less Wages: Cal-Mat Covid-19 Temporary Assignment from December 14, 2020 to March 22, 2021 | | $19,718 |
| Bathke's Damages: | | **$734,376.50** |

## CONCLUSIONS OF LAW

1.     This is a breach of contract case.

2.     The Court initially had jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) but now has jurisdiction pursuant 28 U.S.C. § 1367 (supplemental jurisdiction). The Court has personal jurisdiction over the parties.

3.     Bathke's employment was governed by the Exempt Employee Agreement, plus the Union Contract, which states that Bathke could not be terminated "except for "cause" with the grounds therefor to be the same as those applicable to the City's union-represented employees, including provisions relating to any reduction-in-force."

4.     Extrinsic evidence shows that, with respect to union represented employees, the City has a progressive, corrective discipline process.

5.     The standard in *Baldwin v. Sister of Providence in Washington*, 112 Wn.2d 127 (1989), applies and was not met. This is because the *Baldwin* standard of discharge must satisfy the following elements:

   a.   Fair and honest reason regulated by good faith on the part of the City;

   b.   Reasons which are not arbitrary, capricious, or illegal;

   c.   Reasons which are based on facts supported by substantial evidence; and

   d.   Which is reasonably believed by the employer to be true.

*Id.* at 139.

1      6.    The City has breached this standard by failing to act reasonably and use

2 good faith in properly investigating the allegations or providing a fair process to Chief

3 Bathke.

4      7.    The City breached its agreement with Bathke.

5      8.    As a result of the breach, Bathke suffered damages in the amount of

6 $734,376.50.

7      9.    Since the dispute arose regarded the EEA, each party "shall be responsible

8 for their own attorney's fees in any Court action[.]" No award of attorney's fees is made.

9      Dated this 15th day of April, 2021.

10

11

12 BENJAMIN H. SETTLE
United States District Judge

13

14

15

16

17

18

19

20

21

22